G2P7FAZC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

VINCENT M. FAZZARI,

                    Plaintiff,

          v.                              14 Civ. 6549 (NRB)

COHEN PONTANI LIEBERMAN
& PAVANE LLP, et al.,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          February 25, 2016
                                          3:30 p.m.

Before:

                    HON. NAOMI REICE BUCHWALD

                                          District Judge

                         APPEARANCES

FRUMKIN & HUNTER LLP
     Attorneys for Plaintiff
BY:  WILLIAM FRUMKIN
     ELIZABETH HUNTER

ABRAMS GORELICK FRIEDMAN & JACOBSON LLP
     Attorneys for Defendants except Cozen O'Connner
BY:  STEVEN BERLIN

G2P7FAZC

1          (Case called)

2          (In open court)

3          MR. FRUMKIN:  William Frumkin, Frumkin & Hunter, for

4   the plaintiff Vincent Fazzari.

5          MS. HUNTER:  And Elizabeth Hunter from Frumkin &

6   Hunter.

7          MR. BERLIN:  Steve Berlin from Abrams Gorelick

8   Friedman & Jacobson, on behalf of all defendants but Cozen &

9   O'Conner.

10          THE COURT:  All right.  Just for the record, I gather

11   that the reason that there is no lawyer here from Cozen &

12   O'Conner is because when my law clerk asked Mr. Frumkin to call

13   counsel about this meeting, Mr. Frumkin didn't remember to call

14   the Cozen & O'Conner lawyer; is that correct?

15          MR. FRUMKIN:  Your Honor, I asked my assistant to.  I

16   thought she had.  But we been having a lot of issues just with

17   CPLP defendants, and maybe she thought that they weren't,

18   because I didn't know they weren't called until we arrived here

19   today when they didn't appear.  So, I apologize to the court; I

20   do take responsibility.

21          THE COURT:  All right.  Well, I mean obviously

22   normally it's customary to have everybody present, but

23   certainly Mr. Frumkin is correct that I think that the disputes

24   in the letters do not involve directly the Cozen & O'Conner

25   firm, and fortunately we have decided because of the amount of

G2P7FAZC

back-and-forth to have a court reporter, so there is a full

record of this hearing, and the lawyers from Cozen & O'Connor

can certainly read what happened.

　　　　MR. BERLIN:  May I?

　　　　THE COURT:  Sure.

　　　　MR. BERLIN:  While I can't speak for the lawyers for

Cozen & O'Connor, and since we are all ready, I would prefer

that we proceed today, but they may in fact have an interest in

some of the issues that we discussed today involving our

request for a protective order.

　　　　THE COURT:  Well, I honestly don't know from the

letters exactly what you're fighting about at this point.  Some

things are not spelled out, and some disputes may -- I'm

keeping my fingers crossed -- have disappeared between the time

the letters were written and today.

　　　　And let me certainly say that it was never the court's

intention that Cozen & O'Conner not be present today.  We even

did make a call to counsel for Cozen & O'Conner and learned

that he was in a deposition.  Had he not been, I would have had

him on the bench phone, and he could have heard as much as he

could have heard, and certainly have had a chance to contribute

to the conversation.  But that was not a possible alternative

since he was at this deposition.

　　　　All right.  That preliminary matter having been

resolved as kind of best we can under the circumstances, let me

G2P7FAZC

1   just put to rest one of the disputes which is the one that I am

2   most, in a sense most directly involved in, and that is the

3   application for reconsideration of my January 7 letter.  Let me

4   just state this clearly for the record.

5            The court adheres to its earlier determination that

6   documentation concerning a suit commenced in 2004 and asserting

7   claims of sex discrimination is not discoverable in this action

8   commenced ten years later and involving a claim of age

9   discrimination.

10           The court has specifically reviewed not only

11  plaintiff's letter of January 21 and February 5 but also Judge

12  Wood's opinion in the Collins case from 2008.  Nothing in these

13  documents supports the requested discovery.

14           One further comment is in order.  Counsel are

15  presumably well aware of the preference in the federal and

16  local rules for informal resolution of discovery disputes.

17  Therefore, in this court's view it's incumbent upon counsel to

18  respond to a substantive letter from an opponent, lest what

19  happened here happen again, that the court resolves the issue

20  without receiving such a response on the assumption that none

21  was forthcoming.

22           Many times my chambers does reach out to counsel to

23  ask if they intend to submit a response, but I think in any

24  circumstance where a letter is substantive, it's advisable for

25  counsel to call and say the letter is forthcoming, if they

G2P7FAZC

intend to put one in, as I say, lest what happened here repeat
itself.  It's not the result I would normally like.  I would
have had no trouble having greater discussion on the issue.

        So, let's move on to the other matters that are
apparently in dispute.  Let me just first ask for clarification
as to whether there remains any dispute about plaintiff's
discovery requests that go back I guess maybe as far back as
April, and which were sort of the subject of letters addressed
to me on February 1 and February 4 where Mr. Berlin represented
that he was prepared to -- actually I'll just read it.

        "I have done so" -- which is to review the earlier
matters, I think -- "and the CPLP defendants will provide a
response to those 56 additional document requests."  And it
goes on to say, "Accordingly, contrary to plaintiff's argument,
there currently is and never was a discovery dispute on this
issue."

        So that letter was written on February 4.  It is now
February 25, literally three weeks later.  Has production been
made?  Is plaintiff satisfied with the production that was
made?

        MR. BERLIN:  The production of these additional 56
requests has -- the bulk of the documents that have already
been produced are also responsive to those 56 requests, but I
haven't yet submitted a written response indicating which
documents are responsive.  We are working on it; we are almost

G2P7FAZC

1       done.  But in between that letter and now we had a lot of other

2       work to do in this case and have done it.  As I advised

3       plaintiff's lawyer, we are almost finished.

4              But there is no dispute in the sense that while there

5       was a misunderstanding as to whether I had to go back and

6       respond to those, there is no misunderstanding, and I agree

7       with Mr. Frumkin that we should respond to those, and so we're

8       almost finished.

9              THE COURT:  Apart from the fact that I'm sure he is

10      disappointed and I'm disappointed that still we haven't closed

11      the loop, I guess, on this, are there any of the requests that

12      you object to that are going to present issues?  Or is it just

13      that you haven't completed the written response but you've

14      produced all the documents?  I'm not sure.

15             MR. BERLIN:  It's the latter.  It's the latter, your

16      Honor.  There may be less than a handful of additional

17      documents not produced because we had already done the search

18      and identified all the documents responsive to the revised

19      requests when this issue came up, and so we did a subsequent

20      search to identify all the documents responsive to these

21      requests.  And all but a handful have been produced already and

22      it's just the written responses that remains.

23             MR. FRUMKIN:  Your Honor, that's not -- my

24      understanding was that we had received responses that indicated

25      there were objections, but that in 56 of the responses that

G2P7FAZC

documents were going to be produced.  The revised requests that

we put in our letter were not the 56, they were other requests.

        So, when Mr. Berlin has told us he is working on the

56, obviously when we get them we would see what we have and

what we don't have and then address it then.

        I was not under the impression that the revised

requests were part of the 56, but I wouldn't even be in a

position to say whether they are or they're not until I receive

them, which we have not received.

        MR. BERLIN:  I think I can clarify.

        THE COURT:  Both 56 to start and 56 the second time?

        MR. FRUMKIN:  No, there were about eight or nine that

were pared down and revised in our letter.  Mr. Berlin

initially thought that was all we were asking for.  But we

didn't respond to the others because we were already told we

were getting them.  So, we have not received the responses,

objections or documents in relation to the 56.

        So, I'm somewhat confused if the 56 are now covered by

the others -- which I don't think they were -- but what I'm

ultimately telling the court is that until I receive objections

or responses -- or we receive -- and documents, we wouldn't be

in a position to know what we received and what we didn't

receive.  So we're still out -- the jury is out on that one, I

guess.

        MR. BERLIN:  I will try to explain.  I'm not going to

G2P7FAZC

1   go into the history of how we got to this issue.

2              THE COURT:  Please, I really would appreciate that.

3   Don't.

4              MR. BERLIN:  I'm not.  But once we got there, and I

5   agreed, of the 87 or 88 original document requests, there were

6   56 which our original -- this is before we had the ESI

7   search -- 56 which we posed lots of objections but said we

8   would produce documents subject to those objections pursuant to

9   a search.  And that was in our initial response.

10             So when I ultimately agreed with Mr. Frumkin that I

11  should go back and respond to those requests as well, we did

12  internally do a search to identify documents from the hits that

13  we got from our original ESI search to find documents

14  responsive to these 56 requests.

15             Most of the documents identified were already produced

16  in response to the revised document requests.  They cover a lot

17  of the same turf, do most of the documents that we have

18  identified as responsive to these 56 requests have already been

19  produced, and there is about a handful more that will be part

20  of a supplemental production which hopefully I'll finish next

21  week when I complete the written response to these 56 requests.

22  And I believe I explained that to Ms. Hunter but it may not

23  have been clear.

24             THE COURT:  OK.  But the question that I still have

25  is:  Should Mr. Frumkin expect, or should I expect, that there

G2P7FAZC

 1   are documents that exist that you're withholding on some

 2   ground?

 3           MR. BERLIN:  No.

 4           THE COURT:  No?  OK.  So regardless of the sort of

 5   good lawyering preamble that says "subject to the following

 6   objections, we will produce responsive documents," the preamble

 7   is as a practical matter irrelevant.  You are producing

 8   whatever you have that they asked for.  Yes?  No?  Except for

 9   what I've already ruled on.

10           MR. BERLIN:  I believe that's correct.  And I may find

11   out that I'm incorrect on one or two documents or a handful,

12   but I don't think so, because I have already been through part

13   of this already, and I believe that's correct.

14           MR. FRUMKIN:  Your Honor, from what we received it

15   seems like not everything was produced, but I don't want to

16   waste your time now without knowing.

17           THE COURT:  Well, I also don't want to keep doing

18   this.

19           MR. FRUMKIN:  Understood.

20           THE COURT:  And that doesn't mean I'm sending you to a

21   magistrate.  I'm not doing that.  But I would like to use this

22   meeting with the court reporter to nail down whatever it is

23   that we can nail down.  So what is it that you, Mr. Frumkin,

24   believe exists or should exist and that is responsive to

25   document requests you have served but that you haven't

G2P7FAZC

1  received?

2          MR. FRUMKIN:  Your Honor, I have to be totally open

3  with the court, I am not prepared to address that today for the

4  simple reason that Mr. Berlin indicated to me that in the

5  e-mail that came with the documents I believe on February 12

6  that we would be receiving them as soon as possible.  And we

7  haven't received them.

8          So, I haven't -- I did a cursory -- we did a cursory

9  review of what we did receive, and a lot of it did not

10  necessarily seem responsive to the requests that we made.

11          The categories here are billing issues amongst all the

12  attorneys, bringing in business issues.  You know, there are a

13  lot of documents that were missing which was going to be the

14  30(b)(6) issue about what was retained and what wasn't

15  retained, what firm did what in terms of whose decision making

16  it was to have these lawyers go from one firm to the other.

17  The Cozen people seemed to think that it was all CPLP, and some

18  of that we're hoping to ferret through the documents.

19          So, unfortunately I can't really answer your question

20  because I didn't take the time to prepare that, because I knew

21  I was getting more information, and I thought I was doing the

22  court a favor until we had it all, and then we were in a

23  position to speak to Mr. Berlin, try to work that out, and then

24  if we had to come to the court.

25          In addition, your Honor, there is supposed to be

G2P7FAZC

1    revised interrogatory responses, which we also requested in our

2    same letter, that haven't been responded to either.

3            So, it was my feeling -- and again if the court

4    doesn't agree -- that we should get the whole pie, look at it

5    and then see what we have and what we don't have, try to work

6    it out and then go from there.

7            THE COURT:  Well, look, I obviously want you to try to

8    work it out; no judge would want anything else.  I just took

9    from your comment here that you had concluded that there were

10   obvious gaps to you in the production that you had received,

11   and I was going to try to tease that out to see if we could

12   talk about it.  But I gather you're not in a position to tell

13   me what it is that you think is obviously missing.

14           MR. FRUMKIN:  I couldn't say, your Honor, because it

15   might be coming.  You know, it might be referenced as something

16   else that we receive.  Like I said, we don't have the complete

17   production, and based on my experience, I didn't know that your

18   Honor was going to go into it without us having it.  If I had

19   it and went through it and consulted with counsel, then we

20   would certainly be prepared to do that.

21           THE COURT:  Well, can we get, Mr. Berlin -- because

22   just as plaintiff's counsel and plaintiff probably has gotten a

23   little frustrated, so have I -- when are we going to bring this

24   initial phase of document requests and interrogatory answers to

25   a total end?  I mean at least an end from the perspective of

G2P7FAZC

```
1    the Cohen Pontani production.  I wouldn't be shocked to hear
2    that we'll have some battles afterwards, but at least when is
3    this going to absolutely come to an end?  It's too long; it's
4    too slow.
5              MR. BERLIN:  My intention is to complete it -- and I'm
6    close to done -- complete what I need to do.  It's just not the
7    only thing I have to do, but I understand that's not your
8    Honor's problem.
9              THE COURT:  Well, we understand the issue.
10             MR. BERLIN:  But to complete it by next week, to be
11   completed, but it's conceivable it might be the week after, and
12   then I will be completely done.
13             THE COURT:  I will give you until March 7, that's it.
14   Get it done.
15             MR. BERLIN:  Thank you, your Honor.
16             THE COURT:  You are just going to have to make this
17   more of a priority.
18             OK.  There seems to be -- although this is based on
19   letters I have in front of me.  I didn't know what the dispute
20   is.  What is the 30(b)(6) dispute?
21             MR. BERLIN:  If I may, since I raised it.  I imagine
22   at your suggestion at the November 3 conference, plaintiffs
23   eventually served the 30(b)(6) notice.  The list of items that
24   they asked that the individual representative of CPLP testify
25   about seemed inappropriate to me in certain respects, and we
```

1    served them with objections.

2              We had a conversation with an attempt to resolve those

3    objections and see if we can come to some agreement as to the

4    specific scope of the testimony that the representative would

5    have to give.  We could not resolve it, and so we appropriately

6    asked for a premotion conference on protective order.  We

7    didn't submit more documentation than we did, because we were

8    waiting to hear from the court to find out what you wanted in

9    terms of the submission.  But I do have --

10             THE COURT:  Do you have a copy of --

11             MR. BERLIN:  I have a copy of the notice and our

12   objections.

13             THE COURT:  OK.  If I could see that.

14             OK.  I think it's pretty clear that I'm not in favor

15   of discovery going back to 2003.  I don't see any reason that

16   the relevant period that I've set should not apply to the

17   30(b)(6) witness.

18             MR. FRUMKIN:  Your Honor, just to explain, we

19   understand that fully in terms of, you know, what might be

20   relevant to the case, but we don't know when these systems of

21   how documents are kept were set up.  I mean that could have

22   happened 20 years ago; we really just don't know.  And what we

23   wanted to do was examine the witness and find out when these

24   systems went into place.

25             I think the fact that the information relevant to the

G2P7FAZC

1    case may be five years before Mr. Fazzari was not retained in

2    this position.  But when the systems were set up and how

3    document are maintained, you know, that could have been from 20

4    years ago.  I don't really know what it is.

5          So, what we said to Mr. Berlin was, you know, let us

6    ask your witness about that, and if it turns out that it's

7    irrelevant, it's irrelevant.  But it's not the same issue in

8    terms of how documents are stored and when those procedures

9    went into place that don't exist now because of this alleged

10   Sandy thing being the same timeframe for relevance to this case

11   in terms of proving discrimination.  We are talking about where

12   documents are and what happened to them, not whether our client

13   was discriminated against and whether the comparators, etc. or

14   issues that arose in the case are relevant to that.

15         THE COURT:  No one -- I don't think anyone is

16   suggesting that you can't ask a question along the following

17   lines:  What was the system utilized to maintain records

18   between July 1, 2006 and July 1, 2011?  Where were those

19   records maintained?  Who was in charge of them?  What

20   difference does it make whether that system that was in place

21   then was set up 20 years earlier?  Who cares?

22         MR. FRUMKIN:  I don't know, your Honor.  I don't know

23   how the questions are going to be asked.  Personally my feeling

24   was to limit the timeframe --

25         THE COURT:  Let's say they had documents from 2003

G2P7FAZC

that were kept in one location and the documents from 2006 were

kept someplace else, and the documents from 2006 took a hit

from Hurricane Sandy but the documents from 2003 that were

stored someplace else didn't take a hit.  You're still not

getting the 2003 documents.  Who cares where they are?

MR. FRUMKIN:  I understand, your Honor, but again this

is discovery.  My argument to you is this is discovery, it's

broad.  We just wanted to know how the records were kept.  I

don't want to run into a problem and be back here again

because --

THE COURT:  Well, but what is the problem?  What can

the problem possibly be?  I mean every time you ask for more

than you should get, all it does is lead to another dispute

which slows down your case, which is something that you the

plaintiff do not want.

MR. FRUMKIN:  I agree, your Honor.

THE COURT:  So you have to zero in on what you need

and not give the defendant a chance to object, because every

time they get a chance to object they slow down the case to

their advantage, not to your advantage.  I mean it's just not

the best approach.

MR. FRUMKIN:  Your Honor, I think the point is we

didn't want to be restricted in trying to find out where the

relevant documents are, what happened to them, how they were

maintained.

G2P7FAZC

1              THE COURT:  Then don't ask about irrelevant documents.

2              MR. FRUMKIN:  Well, it just seemed to me that to have

3        a time limitation on how they were maintained -- and they might

4        say I don't have to answer that question because that system

5        went into place in 2000 and that's not relevant -- to where the

6        documents are now, I just don't know, your Honor.  It just

7        seemed to me to be somewhat of an obstructionist position to

8        take, and that's why we couldn't agree on it.

9              THE COURT:  Well --

10             MR. FRUMKIN:  Obviously we're not asking for documents

11       from 2003.

12             THE COURT:  If the 30(b)(6) witness raised an

13       objection like that and didn't answer the questions about the

14       information retention system in place during the relevant time

15       period, I suspect you would probably call my chambers, and I

16       would resolve that swiftly.

17             MR. FRUMKIN:  Your Honor, it was our understanding of

18       the process here that the purpose of the schedule that

19       accompanies the 30(b)(6) is to deal with the subject matter

20       that we'd like a witness to be aware of, so when we get to the

21       deposition then we ask the questions.  If the problems come up

22       and it's either outside of the timeframe --

23             THE COURT:  But you have no right to have a witness

24       prepared on information that's irrelevant.  That's the bottom

25       line.

G2P7FAZC

 1          MR. FRUMKIN:  Well, your Honor, like I said, I didn't

 2     think that the timeframe relevant to obtaining evidence to

 3     prove the case is the same issue as how documents are

 4     maintained and when documents are maintained.

 5          THE COURT:  Well, you curiously picked 2003, which

 6     happens to be the year that Ms. Collins was fired, so I

 7     certainly understand why the defendant had a negative reaction

 8     to that in light of the other disputes.  So that I think takes

 9     care of the first.

10          And like 5, what would be the relevance of even asking

11     about categories of documents related to the purchase of

12     pencils, which is included in that?  Those would be

13     administrative documents.  Supplies for the firm?  Why?

14          MS. HUNTER:  Your Honor, you're right, I don't think

15     we want to know about supplies that were purchased.  I think

16     our concept of administrative was, you know, probably more

17     along the lines of, you know, how the firm is run, who makes

18     decisions about handling out case assignments or, you know,

19     matters of bringing in business.  I agree with you, I don't

20     think we were looking to know about pencils.

21          And, certainly, if we ask that question what types of

22     documents are kept at the firm, and he would say one type of

23     document is about purchasing and supplies, that would not be a

24     category we would continue to pursue through the deposition; we

25     would move on to more relevant categories.

G2P7FAZC

1          I mean this was just obviously our notice with the

2     types of topics we might want to cover at the deposition, to

3     give them notice of what type of person they should designate

4     for the deposition.  You know, it's not a precise listing of

5     the questions we're going to ask.

6          MR. BERLIN:  Your Honor, if I may.

7          THE COURT:  Yes.

8          MR. BERLIN:  What Ms. Hunter said is precisely the

9     problem with this.  Unlike a regular deposition where

10    Mr. Lieberman who is designated might be deposed as a fact

11    witness, and they want to explore the extent and scope of his

12    knowledge, this is a 30(b)(6) where he was asked to prepare

13    himself with knowledge that the entity has on particular

14    topics, and, you know, generally speaking, these kinds of

15    requests need to be with particularity.  So, for instance, an

16    open ended request for administrative documents including but

17    not limited to, leaves it up to us to figure out what they are

18    thinking about.

19         As this colloquy just indicates, your Honor thought it

20    could include something as literal as pencils, and Ms. Hunter

21    says, no, we really didn't mean that.  But the way it's

22    written, it's up to me to guess.

23         But really what is important I think -- because all

24    the requests are basically seeking to identify -- the purpose

25    of this 30(b)(6) is to identify documents that exist that they

G2P7FAZC

1    might still be able to seek discovery of, or to find out

2    documents no longer exist.  And I think that's the purpose, but

3    they should indicate what documents they need to know about at

4    this point.

5            THE COURT:  Look, let's go back.  Refresh me.  Because

6    of Hurricane Sandy what happened?

7            MR. BERLIN:  It's not exclusively because of Hurricane

8    Sandy.  We have two sets of documents, hard copy and

9    electronic.  Certain hard copy documents were brought over to

10   Cozen O'Connor when the individuals joined Cozen O'Connor.  And

11   the firm had a great deal of documents in a storage facility --

12   hard copy documents -- not only case files -- but hard copy

13   documents in a storage facility in Oceanside, New York.  That

14   facility was flooded during Hurricane Sandy, and a significant

15   amount of the files were wet and destroyed.  Several other of

16   the files have subsequently been destroyed at the direction of

17   the CPLP because they didn't want to incur the storage costs

18   anymore, and they were case files they didn't need.

19           So there are two sets of -- initially I was under the

20   impression they had all been destroyed by Sandy, but as you

21   recall last time we were here I corrected that.

22           THE COURT:  OK.

23           MR. BERLIN:  So, and then there were the electronic

24   files, and there were 14 servers which were brought over to

25   Cozen O'Connor.  I don't know what they did with them all.

G2P7FAZC

They may have imported some stuff and not other stuff.  But the
14 servers were in the storage room, and now those 14 servers
are held by my ESI vendor.

In addition, in preparation for the 30(b)(6) -- and I
might as well disclose it, just to make it clear -- there was
another server that had administrative files, and that was kept
in the home of the office manager and destroyed in Sandy.  She
lived in Long Beach, New York.

So, I think the purpose of this 30(b)(6) was to find
out what we had, where it might be, what exists and what
doesn't exist -- that's my understanding -- but not with regard
to anything in the universe but with regard to things that they
might need to know about for purposes of the case.

THE COURT:  OK.

MR. BERLIN:  And when we last talked about this is
when you suggested why don't you take a 30(b)(6) and find out
exactly what happened.  So I assume that's how this happened.

THE COURT:  So then the focus of the 30(b)(6) is
not --

MR. BERLIN:  May I interrupt?

THE COURT:  Sure.

MR. BERLIN:  I know Ms. Hunter said they're concerned
with how the firm ran, how it was operated.  None of that is in
this notice.  So until I got here, until she said that before,
I never understood that that would be the focus of the

G2P7FAZC

1    30(b)(6).

2              THE COURT:  Because, in other words, that's may be

3    sort of what I'm trying to articulate.  I'm having a little

4    trouble with it.  But there is a difference between a 30(b)(6)

5    deposition -- which is what I think I contemplated -- which was

6    designed to learn what records are still in existence and what

7    records were destroyed and how, versus a 30(b)(6) deposition

8    which is actually designed to get substantive information.

9    This is not a 30(b)(6) to get substantive information.  And I

10   think that maybe what Mr. Berlin was just sort of getting at is

11   Ms. Hunter's answer to my question sounded like I want to be

12   able to ask this witness how did you kind of operate this firm.

13             This is much more like a records custodian.  This

14   could be -- I don't know.  Maybe, Mr. Berlin, I know you

15   identified somebody who is going to be the 30(b)(6) witness.

16   His name is Lance something?

17             MR. BERLIN:  Lance Lieberman.  He is one of the

18   individual defendants, Lance Lieberman.

19             THE COURT:  And he is a lawyer, I gather?

20             MR. BERLIN:  He is a lawyer.

21             THE COURT:  And was his sort of -- what was his -- did

22   he have an administrative role Cohen Pontani or not?

23             MR. BERLIN:  All the partners had some administrative

24   functions, but my understanding is that he was the partner that

25   was most familiar with the record management systems that they

G2P7FAZC

1    had.

2            THE COURT:  And was Cohen Pontoni large enough to have

3    an IT department?

4            MR. BERLIN:  They had an IT person.  But the questions

5    here are much broader than what that person would know.

6            THE COURT:  I mean some of this is very substantive.

7    This is what was --

8            MR. BERLIN:  We believe Mr. Lieberman will be able to

9    answer the questions.  He has made efforts to get information,

10   as a 30(b)(6) witness normally would do that is not readily in

11   his recollection.

12           THE COURT:  Well, that is his job as a 30(b)(6)

13   witness, to learn.  I mean like 7 is not a 30(b)(6) document

14   witness.  It asks for substance.  It's, you know, OK to ask the

15   witness are there, to your knowledge, any documents which were

16   created in connection with the Cohen Pontoni/Cozen O'Connor, I

17   guess, merger, but it's not appropriate to ask what kind of

18   actions did the firm take as they considered joining or being

19   acquired by some other firm.  And that's a substantive

20   question; that's not the purpose of this 30(b)(6) deposition.

21           MS. HUNTER:  I think number 7 as it's written says

22   "actions taken with respect to CPLP documents and/or ESI".

23           THE COURT:  What does that mean, "actions taken with

24   respect to documents"?

25           MS. HUNTER:  Again, your Honor, these are just the

G2P7FAZC

 1    topics as we tried to present them.  This is not how we're

 2    going to exactly word the question.  I think the concept is we

 3    want to know when you were getting ready to do the merger with

 4    Cozen, or you were being involved in the due diligence process,

 5    you know, what documents did you gather together to send to

 6    Cozen?  I think that relates to the documents.  I think that --

 7              THE COURT:  That's a very different question.

 8              MS. HUNTER:  I think generally the purpose of, and as

 9    you stated, of this 30(b)(6) deposition is to figure out what

10    documents existed before, and for that reason we do need to ask

11    some background questions about how documents were kept at the

12    old firm as it existed then, and then what was done with those

13    documents.  Were some of them sent to Cozen during the due

14    diligence process and therefore we can get them from Cozen?

15    Were some of them put on servers?  Were some of them imported

16    to Cozen?  That's what we're trying to find out.

17              THE COURT:  But that assumes that you have served a

18    document request on Cozen and Cohen Pontani, and they've hidden

19    documents from you that exist today because they have not given

20    you something; because otherwise whatever category of document

21    you're interested in seeing, you ask for that as a document

22    request.

23              MS. HUNTER:  We have done that.  We did make -- you

24    know, I think Mr. Berlin is correct -- 70 or 80 document

25    requests.  But in written responses I believe to those document

1    requests, but certainly in conversations with Mr. Berlin, he

2    said I don't think those documents exist anymore; I think they

3    may have been destroyed in the hurricane.

4            As he stated when he stood up before, he doesn't know

5    for sure what does exist.  He said that there are 14 servers

6    that were brought over to Cozen.  He said himself that he

7    doesn't know what is on them.

8            THE COURT:  Well, wait a second.  I assume that the

9    hard copy files that still exist, that the computers that still

10   exist or the servers that still exist have been searched.  Yes?

11   No?

12           MR. BERLIN:  Well, what has been searched is -- I can

13   answer your question, but I also want to correct one statement.

14   I didn't say that these documents have been destroyed, because

15   I don't know what's been destroyed.  So I think there is a

16   question.  But I just know that I don't have a lot of hard copy

17   documents to search, and I made that clear.

18           But, yes, as we discussed at the last conference,

19   Cozen O'Connor made available to us the e-mails that they

20   imported from the five partners, individual defendants, when

21   those individual defendants joined Cozen O'Connor.  They made

22   them available to us.  We searched them with the search terms

23   plaintiff gave, and then from the hits I got I, I looked for

24   documents that were responsive to the questions they made.  And

25   that is what has been produced, and the supplemental production

G2P7FAZC

 1    we talked about before, we will finish that.

 2            And whatever hard copy documents we had, we searched.

 3    And I did tell Ms. Hunter that I found a few other documents,

 4    and that they will be included in this production -- a few

 5    meaning like two -- included in this production.  That's it.

 6            THE COURT:  What about the 14 servers?

 7            MR. BERLIN:  Well, that's what we talked about at the

 8    last hearing.  The 14 servers, the estimates I got were that it

 9    had four terabytes of data and that it would be -- and I got

10    significant cost for searching it.  So we talked about what

11    would be the appropriate thing to search, and we talked about

12    the five individual partners' e-mails, which I was able to

13    access from Cozen O'Connor, and that's what was searched.

14            MR. FRUMKIN:  Your Honor, there is --

15            MR. BERLIN:  14 servers are offline; they're just

16    preserved; we have them.

17            MR. FRUMKIN:  I just want to bring up one point that

18    led to the 30(b)(6), and that was we made all of these requests

19    in April of last year.  We were told all along the way that all

20    the documents were destroyed in Sandy.  And we have discussed

21    that.

22            November 3, the day that we came back here last, that

23    morning, I was told that there were e-mails that existed the

24    entire time that the CPLP partners brought with them to Cozen

25    O'Connor.  And so when Mr. Berlin says Cozen O'Connor, you

G2P7FAZC

1    know, he just found this out, I mean his clients knew the whole

2    time that they had access to all of those e-mails.  They had

3    to, because they brought them with him.

4            That's when it was discovered.  That's why your Honor

5    suggested the 30(b)(6), because we have just gone through eight

6    months of having nothing available to suddenly have them

7    available by Mr. Berlin's client, who knew they were available

8    the whole time, because they obviously were using them; they

9    brought them with them over there.

10           That's the history of this.  That's why there are

11   detailed subject matter about what happened to the documents,

12   because we were initially told nothing existed until suddenly

13   they appeared.  And we believe they knew the whole time that

14   they had them, because they are the ones using them at Cozen

15   O'Connor.  So that's the history of this.

16           MR. BERLIN:  So, your Honor, I mean that's not the

17   complete history, and I don't know if I have to rehash what we

18   talked about the last time.  But it's not nefarious at all, and

19   it didn't work and operate that way.

20           But he is correct that I never said the e-mails were

21   destroyed.  I indicated that we had them on the servers and

22   that I had communicated about the scope and the extent of the

23   information on the servers, and the cost of searching those

24   servers and trying to initiate a dialog with regard to that.

25           I explained all of this last time, and if you don't

G2P7FAZC

 1    want me to do it again, I won't.

 2            MR. FRUMKIN:  It wasn't until November, Judge.  I'm

 3    sorry to interrupt.  It was in November that we first learned

 4    that e-mails existed.  I don't know what happened from April to

 5    November.  Again, whether it was nefarious or not, it's just a

 6    fact that that whole gap we had nothing, and we had no answers

 7    about anything.

 8            MR. BERLIN:  Again, I can round out the story and

 9    explain it, but the point is the discussion that we had last

10    time is what led your Honor to say why don't you just take a

11    30(b)(6) and find out what happened to the documents.  And so

12    my understanding is the purpose of this is to find out what

13    documents existed electronically or otherwise and what happened

14    to them, do they exist anymore or not, and if they exist where

15    are they, and if they don't exist, why not.  That's what I

16    thought the purpose was.

17            THE COURT:  That sounds right.

18            MR. BERLIN:  So we get to the bottom line and then

19    move forward.

20            So, some of these questions go a little bit beyond

21    that.  And I appreciate the effort that plaintiff's counsel

22    went into in drafting this, but again a 30(b)(6) is also a

23    little bit different than another deposition.  I have to

24    prepare a witness to be able to respond to questions on these

25    topics and that includes, as we just discussed a few moments

G2P7FAZC

1   ago, him endeavoring to go out and obtain information that he

2   doesn't personally have, that the organization does have, so

3   that he can respond to this.

4        And some of these questions are very broad based,

5   they're loosely drafted.  And what I had asked for besides the

6   date range objection, is for a little more precision so that

7   therefore I can properly prepare my witness.  That's what I

8   asked for, and that's what the bulk of these objections are

9   about.  What do you need to know?  Tell me so I can prepare my

10  witness.

11       THE COURT:  Well, let me say that it seems to me that

12  we're now talking essentially about a win win, because if the

13  plaintiff is more specific and targeted in sharing what it

14  really is that you are thinking about and want to learn, that

15  increases the likelihood that Mr. Lieberman will know the

16  answer to what it is that you're asking.  Because to the extent

17  that it remains vague, then just like the defendant can in

18  writing object, at the deposition the answer is going to be I

19  didn't understand that that is what you meant and, therefore,

20  I'm not prepared to answer that.

21       So I would suggest that the way to cut through this --

22  and I think a great deal of it is resolved by taking out the

23  time period that is in my view overbroad, that some greater

24  clarification on the different requests might be useful -- I

25  really think mutually useful.

G2P7FAZC

1          I mean the whole point is -- again let's just look at

2     16:   Types of documents maintained only in hard copy format and

3     for each type, the custodian, the location where documents were

4     maintained at CPLP and the current location of such documents.

5          I mean what if they are the invoices for the pencils?

6     I mean who cares?  And yet it is totally broad enough to be

7     read that way.

8          So, if there is really, you know, something that you

9     really want to know about, why don't you send a clarifying --

10    it could be a letter, it could be an e-mail, it could be

11    another request.

12         MR. FRUMKIN:  Your Honor, you know, we would be

13    pleased if it would assist the court and counsel to maybe take

14    another try at this in a sense of looking at the subject

15    matter, narrowing that down and maybe being more specific,

16    which maybe might help move this along, if that will make it

17    work.

18         THE COURT:  I mean, look, the whole point is you are

19    fortunate in a sense to have Mr. Frumkin as your client,

20    because he was there.

21         MR. FRUMKIN:  Mr. Fazzari.

22         THE COURT:  I'm sorry, the Fs guy.

23         MR. FRUMKIN:  I would like to be my client at some

24    point, but that's not supposed to be a good idea.

25         THE COURT:  All right.  Depends on the client is.

G2P7FAZC

1          But the whole point is he was there.  He presumably

2     has a more refined knowledge of what kind of documents they

3     kept, how they operated.  But between Mr. Fazzari and you guys,

4     you must know what it is that you really are looking for.

5          I mean what do you think is significant?  You really

6     don't care about a whole host of pieces of paper or computer

7     files that exist.

8          I mean tons of this stuff could be -- you know, the

9     Social Security withholding records for the secretarial staff,

10    you couldn't care less about stuff that's there.  You will know

11    it's there, but there is something else you're looking for.  I

12    know you're not looking for that.  I don't know exactly what

13    you are looking for, but if you articulate this, you are going

14    to get a better witness and you are going to be able to move

15    forward more rapidly.

16         You really need to focus.  The idea is not the broad

17    request.  What are you really looking for?  What do you think

18    are your potential smoking guns, you know, the things that are

19    really going to make or break your case?  I have no idea, but I

20    do know that if you focus, you will move faster.

21         MR. FRUMKIN:  Right.  Your Honor, I think -- and maybe

22    it was implicit -- both sides know what the case is about, and

23    both sides know what we're interested in having.

24         THE COURT:  You have to write it.  You just give him a

25    chance to come in and object.  Right?

G2P7FAZC

1          MR. FAZZARI:  Can I say something?

2          THE COURT:  I don't know.  It depends on whether your

3    attorney will like it.

4          MR. FRUMKIN:  Go ahead.

5          MR. FAZZARI:  I say this because you just made a

6    reference to it was fortunate to have me because I was there.

7    True, I was there.  I don't know how they kept their documents,

8    how they classified them, what they called them.  They were

9    very closed about anything.

10          And, as an example, they recently produced what they

11    said was my personnel file, and I went through it, and there

12    are things missing from that.  They were supposed to be

13    preserved completely in the personnel file.  There is one memo

14    that says that there are three other reviews on file for me.

15    There are no reviews in the personnel file they produced.

16          So, you would expect them to be in the personnel file,

17    but they're not.  So they're either in another file or this is

18    not a complete file.  And it could be that they were keeping

19    review files as separate from personnel files, but I don't know

20    what they would call them.

21          THE COURT:  OK.  Well, but there is --

22          MR. FAZZARI:  And that's the problem we're facing; we

23    don't know what they call a particular file.

24          THE COURT:  But you don't need to know what the name

25    of it is.

G2P7FAZC

1          MR. FAZZARI:  That's why it's topical, your Honor.

2          THE COURT:  You know, it's easy enough I think to ask

3    for all records of Mr. Fazzari's employment including but not

4    limited to --

5          MS. HUNTER:  We did.

6          THE COURT:  -- whatever.  And whether -- and it

7    wouldn't be inappropriate to have a 30(b)(6) witness, you know,

8    to ask the question -- you know, your production has not

9    included performance reviews; there is an indication of the

10   existence of those reviews.  You know, can you explain it, why

11   they don't exist?  I mean do you believe they exist?  If so,

12   why haven't they been produced?  Do you believe they were

13   destroyed?  Can you explain it?

14         MR. FRUMKIN:  Your Honor, we did make that request,

15   and I was hoping when we get the rest of the documents that may

16   be in another file and would be produced before we went into

17   this battle of what happened to them.

18         But I guess ultimately the point is if it would make

19   it easier, we can specify the categories.  I believe Mr. Berlin

20   is aware of the relevant categories in the case, but we could

21   specify that and maybe try to work this out to this extent

22   rather than using the court's time.

23         One issue though, I think the court did speak to this,

24   that in each objection it talks, it says CPLP will produce

25   Lance Lieberman to testify regarding the subject matter to the

G2P7FAZC

1    extent he has knowledge of responsive information.  It

2    shouldn't really be to the extent he has knowledge.  He is

3    either supposed to learn the knowledge or someone else who has

4    the knowledge should also be produced.

5            THE COURT:  Well, I think --

6            MR. FRUMKIN:  So I don't want to get involved in that

7    later.

8            THE COURT:  Look, there is no question the 30(b)(6)

9    witness is supposed to educate himself to respond, but I think

10   that, you know, until the categories are more precisely

11   delineated, it's going to be hard to either prepare and hold

12   him responsible for lack of ability to respond.

13           So, truly I'm not offering this suggestion simply to

14   either get out of work myself or to put my thumb on the scale

15   of either side here.  It is truly a win/win.  The more precise

16   the question, the more the 30(b)(6) can get educated, and the

17   more likely there is to be some consequence of his failure to

18   be educated on something.  It just makes it a better event.

19           So, since you guys say you do know what each of you

20   are looking for, it's not a secret.  I mean if you tell them

21   what you're looking for, it's not going to give away the case.

22   You know, you may want a document that is a smoking gun, but we

23   all know exactly what kind of document that smoking gun would

24   look like, right?

25           MR. FRUMKIN:  Correct, your Honor.  I think we can

G2P7FAZC

1   probably work together on that.

2          THE COURT:  OK.  Is there anything else we need to

3   talk about today?

4          MR. BERLIN:  Not from us.

5          MR. FRUMKIN:  I don't believe so.

6          THE COURT:  OK, thanks.

7          MR. BERLIN:  Thank you, your Honor.

8          (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25